**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| ALUMINUMSOURCE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No.: N18C-07-231 EMD CCLD |
| v. | ) | |
| | ) | |
| LLFLEX, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: October 26, 2020[1]
Decided: January 21, 2021

*Upon Defendant LLFlex, LLC's Motion for Summary Judgment as to the Amended Complaint*
***GRANTED in part and DENIED in part***

Thad J. Bracegirdle, Esquire, Bayard, P.A., Wilmington, Delaware, Elliot Richardson, Esquire, Michele D. Dougherty, Esquire, Ryan D. Gibson, Esquire, Korey Richardson LLC, Chicago, Illinois, *Attorneys for Plaintiff AluminumSource, LLC*

Benjamin A. Smyth, Esquire, McCarter & English, LLP, Wilmington, Delaware, Andrew Gold, Esquire, Erica Gomer, Esquire, Akerman LLP, Fort Lauderdale, Florida, *Attorneys for Defendant LLFlex, LLC*

**DAVIS, J.**

## I.     INTRODUCTION

This is a civil action brought in the Complex Commercial Litigation Division involving a claim for fraudulent inducement and for breach of the Membership Unit Purchase Agreement ("MUPA").  Plaintiff AluminumSource, LLC ("Aluminum") alleges that Oracle Flexible Packing, Inc ("Oracle" or "LLFlex") made several intentional misrepresentations in the Estimated Working Capital statement and that these misrepresentations induced Aluminum to

---

[1] D.I. No. 87.

enter into the MUPA. Aluminum also claims that Oracle breached the contract by withholding annealing racks and the full-time services of Jack White. Oracle is the predecessor by merger of Defendant LLFlex, LLC ("LLFlex").[2] LLFlex filed this motion for summary judgment.

Aluminum filed its Complaint against Oracle on July 24, 2018. The Court granted a motion to dismiss without prejudice on January 10, 2019. Aluminum then filed an Amended Complaint on January 28, 2019. The Amended Complaint contains two claims for relief: (i) Fraud in the Inducement (Count I); and (ii) Breach of Contract (Count II). On February 12, 2019, the Court denied Oracle's second motion to dismiss on the record. The Court granted Aluminum's motion to substitute LLFlex for Oracle as the real party of interest on April 18, 2019.

On July 29, 2020, LLFlex filed this Motion for Summary Judgment (the "Motion"). The Court held a hearing on the Motion on September 30, 2020. At the conclusion of the hearing, the Court took the Motion under advisement.

For the reasons set forth below, the Court will **GRANT in part** and **DENY in part** the Motion. The Court will grant summary judgment on Count I to the extent it asserts a claim for fraudulent inducement and deny summary judgement on Count II. The Court will hold a status conference to discuss Count I as a breach of contract claim.

## II.     BACKGROUND

Oracle operated an aluminum business with two primary divisions—the Packaging Division and the Metals Division.[3] The Packaging Division, located on Polo Road in Winston-Salem, North Carolina (the "Polo Road Facility"), purchased rolled aluminum and incorporated

---

[2] The Court will use Oracle and LLFlex interchangeably.
[3] *See* Aff. Of James Squatrito in Supp. of LLFlex's Mot. for Summ. J with attached Cert. of Serv. ¶ 3 ("Squatrito Aff.").

it into products, such as foil lining.[4] The Metals Division ("the Mill") purchased aluminum ingot, milled it into aluminum rolls and sold it by the roll.[5] Prior to the sale, the Polo Road Facility purchased a substantial portion of aluminum from the Mill and the Mill sold the majority of its product to the Polo Road Facility.[6]

Oracle, finding the Mill unprofitable, considered various options including liquidating the Mill or selling it.[7] To facilitate a potential sale, Oracle contributed substantially all of the assets that made up the Mill to a newly created entity, Phoenix Aluminum, LLC, later known as Alpha Aluminum ("Alpha").[8] Oracle also hired an investment banker to market the business.[9] Aluminum became interested in purchasing the Mill and eventually Oracle sold Alpha and the Mill to Aluminum via the MUPA executed on August 11, 2015.[10]

## A. RELEVANT REPRESENTATIONS IN THE MUPA

Article IV of the MUPA contains Oracle's representations to Aluminum.[11] Relevant to this case are Sections 4.10 (Real Property; Personal Property), 4.12 (Sufficiency of Assets) and 4.26 (Limitations on Warranties). The relevant portions of those sections are set out below. Section 4.10(c) provides:

> 4.10 Real Property; Personal Property.
>
> . . .
>
>       (c) Except (i) as set forth on Schedule 4.10(c), (ii) as set forth on the Latest Balance Sheet, (iii) for assets disposed of in the ordinary course of business since the date of the Latest Balance Sheet, or (iv) for Permitted

---

[4] See id.

[5] See id.

[6] See id. ¶¶ 4-5.

[7] See Dep. of Jim Squatrito 24:8-22 ("Squatrito Dep."); Dep. of John Heard 60:11-64:17 ("Heard Dep."); Dep. of Nate Richey 69:8-71:14 ("Richey Dep.").

[8] See Squatrito Aff. ¶¶ 6-7.

[9] Id.

[10] App. To LLFlex, LLC's Opening Br. in Supp. of its Mot. for Summ. J as to the Amend. Compl. Ex. 1 MUPA 000006 (the MUPA).

[11] App. To LLFlex, LLC's Opening Br. in Supp. of its Mot. for Summ. J as to the Amend. Compl. Ex. 1 MUPA 000018 (MUPA Article IV).

Liens, the Company[12] owns, free and clear of all Liens, or has a Contract, license or lease to use, all of the personal property and assets shown on the Latest Balance Sheet, acquired thereafter or located at the Leased Real Property, in each case which is material to the Business or its operations (the "Personal Property"). The Personal Property includes all of the material tangible assets used in the conduct of the Business as currently conducted.[13]

Section 4.12 provides:

4.12 Sufficiency of Assets. Except as set forth in Schedule 4.12, the Company has good, valid and marketable title to, or a valid leasehold interest in or valid license to use, each of its assets, Personal Property and properties reflected in the Financial Reports or that are used or held for use in connection with and necessary for the conduct of the Business as heretofore conducted by the Company (the "Assets"), except for inventory sold following the date of the Latest Balance Sheet in the ordinary course of business consistent with past practice, in each case, free and clear of any Liens, except for Permitted Liens. The Assets, together with the services provided under the Transition Services Agreement, (a) constitute all of the properties and assets used or held for use in the conduct of the Business as heretofore conducted by the Company, and (b) are sufficient in all material respects for the conduct of the Business as currently conducted.[14]

Section 4.26 provides:

4.26 LIMITATIONS ON WARRANTIES. Except as expressly set forth in this Agreement (including, without limitation, this Article IV), Seller disclaims all liability and responsibility for any representation, warranty, or statement made or information communicated (orally or in writing) to Buyer (including an opinion, information, projection or advice which may have been provided to Buyer or any of its Affiliates or any of its or their respective Representatives by the Company, Seller or any Representative of Seller or the Company). ALL IMPLIED WARRANTIES OF MERCHANTIBILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY EXCLUDED. ANY AND ALL PRIOR REPRESENTATIONS AND WARRANTIES MADE BY SELLER OR ITS AFFILIATES OR ANY OF ITS OR THEIR RESPECTIVE REPRESENTATIVES, WHETHER VERBALLY OR IN WRITING, ARE DEEMED TO HAVE BEEN MERGED INTO THIS AGREEMENT, IT BEING INTENDED THAT NO SUCH PRIOR REPRESENTATIONS OR WARRANTIES SHALL SURVIVE THE EXECUTION AND DELIVERY OF THIS AGREEMENT.[15]

---

[12] Throughout the MUPA, "the Company" refers to the Mill.
[13] App. To LLFlex, LLC's Opening Br. in Supp. of its Mot. for Summ. J as to the Amend. Compl. Ex. 1 MUPA 000021-000022 (MUPA § 4.10).
[14] *Id.* at MUPA 000023 (MUPA § 4.12).
[15] *Id.* At MUPA 000032-000033 (MUPA § 4.26)

Both the parties agree that the Personal Property contemplated by Sections 4.10(c) and 4.12 include annealing racks.

## B. THE ESTIMATED WORKING CAPITAL STATEMENT

### i. *Preparation and Delivery of the Estimated Working Capital statement*

Article II of the MUPA provides for the calculation of the purchase price. The purchase price was:

(a) An amount paid at Closing (the "Closing Cash Payment[") equal to:

    (i)    $4,500,000;

    (ii)    Plus the amount by which the Estimated Working Capital exceeds the Target Net Working Capital, if any; and

    (iii)    minus the amount by which the Target Net Working Capital exceeds the Estimated Working Capital, if any;

    (iv)    minus the aggregate amount of Company Debt outstanding immediately prior to the Closing as set forth in the Pay-Off Statements (as defined below);

    (v)    minus the unpaid portion of the Selling Expenses; and

    (vi)    minus $1,250,000;

(b) plus the Promissory Note.[16]

The Estimated Working Capital was to be calculated according to the Section 2.4(a):

(a) Estimated Statement. At least three (3) days prior to the Closing Date, Seller shall prepare and deliver, or cause to be prepared and delivered, to Buyer a statement setting for the Company's good faith calculations of (i) the Net Working Capital as of the close of business on the day immediately preceding the Closing Date prepared in accordance with the principles set forth on Schedule 2.4(a) (such estimate, the "Estimated Working Capital"); and (ii) the Closing Cash Payment calculated in accordance with Section 2.2(a) and this Section 2.4(a) and based on the Estimated Working Capital.[17]

Schedule 2.4(a) defines, "under GAAP," the current assets as the Mill's cash in its bank account, its inventory, trade receivables and prepaid expenses while its liabilities are

---

[16] *Id.* at MUPA 000013 (MUPA § 2.2).

[17] *Id.* at MUPA 00014 (MUPA § 2.4(a))

the Mill's net accounts payable and accrued liabilities.[18]  The MUPA defines GAAP as

"United States generally accepted accounting principles, consistently applied."[19]

Under its Section 2.4(a) obligations, Oracle provided the Estimated Working

Capital statement.[20] The statement estimated the Mill's net working capital to be $5.25

million, or $1.25 million more than the Target Net Working Capital ($4 million).

The Estimated Working Capital statement was prepared by or under the control of

its then CFO, Jonathan Heard.[21] Prior to the sale, there were no independently audited

financial statements for the Mill alone.[22]  The only statements would have been for the

"consolidated company," that is the Polo Road facility and the Mill together.[23]  The

consolidated statements were, however, compliant with GAAP according to external

auditors.[24]

ii.      *Aluminum disputes the Estimated Working Capital statement.*

Aluminum had a contractual obligation to provide a "Closing Statement" within ninety

(90) after closing.  Section 2.4(b) of the MUPA provides:

> (b) <u>Closing Statement.</u> Within ninety (90) days after the Closing Date, Buyer shall cause to be prepared and delivered to Seller a statement (the 'Closing Statement") setting forth Buyer's good faith calculations of (i) the Net Working Capital as of the Closing, prepared in accordance with the principles set forth on <u>Schedule 2.4(a)</u>, and (ii) the Closing Cash Payment calculated in accordance with <u>Section 2.2</u> and based on the Final Net Working Capital.[25]

---

[18] *Id.* at MUPA 000204 (MUPA Schedule 2.4(a)).
[19] *Id.* at MUPA 00009 (<u>"GAAP"</u> definition).
[20] *See* Exs. 3-30 to Pl. AluminumSource, LLC's App. to its Answer. Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 11.
[21] *See* LLFlex, LLC's Op. Br. in Supp. of its Mot. for Summ. J as to the Amend. Compl. 25.
[22] *See* Heard. Dep. 39:18-40:8.
[23] *Id.*
[24] *Id.* at 86:6-19.
[25] App. To LLFlex, LLC's Opening Br. in Supp. of its Mot. for Summ. J as to the Amend. Compl. Ex. 1 MUPA 000014 (MUPA § 2.4(b)).

On November 8, 2015, Aluminum provided the Closing Statement.[26] Aluminum noted several factors relevant to this adjustment. The "biggest single factor" was Oracle's valuation of the aluminum at $1.00 per pound while Aluminum valued it "in accordance with GAAP" to the PLATTS Metals Week Daily Midwest Transaction Price for the day of closing, around $.78 per pound.[27] The Purchase Price Adjustment also alleged overstated weights for various inventory, obsolete inventory, outstanding product quality claims, overstated value for inventory (particularly for finished goods that would have supplied the Polo Road facility), oil valuation, other accruals and natural gas contracts in place. Aluminum ultimately estimated that this added up to an adjustment of $5,027,973.36 in its favor.[28]

LLFlex only disputes the valuation methodology. LLFlex does not dispute Aluminum's other allegations. In addition, Oracle's CFO Jon Heard offered to adjust the purchase price by $362,912 on December 18, 2015 purportedly to satisfy those concerns.[29]

## C. THE ANNEALING RACKS

According to the parties, annealing is a process where metal is heated and allowed to cool slowly, which removes internal stresses and makes it stronger. The Mill annealed aluminum on annealing racks and then delivered the aluminum on the racks to the Polo Road Facility where they remained in inventory until used by the Polo Road Facility, at which point they were returned.[30] Aluminum quickly ran into issues with the Polo Road

---

[26] *Id.* Ex. 7 (Purchase Price Adjustment Pursuant to our 08/11/2015 Membership Unit Purchase Agreement).
[27] Ex. 3-30 to Pl. AluminumSource, LLC's App. To its Answer. Br. in Opp. To Def.'s Mot. for Summ. J. Ex. 12.
[28] *Id.*
[29] *See* LLFlex, LLC's Reply Br. in Further Supp. of its Mot. for Summ. J. as to the Amend. Compl. 6; Amend. Compl. ¶ 6.
[30] *See e.g.* Squatrito Dep. ¶ 19.

Facility holding onto the annealing racks. For example, on August 13, 2015, two days after closing the MUPA, Aluminum emailed Oracle to request the annealing rack's return because Oracle had "almost everyone [of] the Alpha annealing racks (500-600+). [The Mill] will run out in a few hours."[31] Without the racks, the Mill could not ship or create new aluminum rolls to sell.[32] No one testified that the Mill ever shut down because the Polo Road Facility had all the annealing racks.

Aluminum continued to have issues with the annealing racks. On January 27, 2016, Aluminum alleged that Oracle still "had not delivered" annealing racks that had a replacement cost of $900,000.[33]

### D. JACK WHITE'S SERVICES

Oracle agreed to provide certain services post-Closing to the Mill as part of a Transitions Services Agreement (TSA).[34] The parties to this agreement were Oracle and Alpha.[35] The TSA services were, however, part of the MUPA § 4.12 representations.[36]

Under Service Schedule VII, Oracle was to provide the Mill with "the full-time services of Jack White, Director of Sales – Metals, in a manner consistent with the normal duties, responsibilities and authority implied by such position."[37] By December 2015, Aluminum had been complaining that Oracle had not "provided in any material way" the sales support it had agreed to in the TSA.[38]

---

[31] Ex. 3-30 to Pl. AluminumSource, LLC's App. To its Answer. Br. in Opp. To Def.'s Mot. for Summ. J. Ex. 13
[32] *See id.* Ex. 14.
[33] *Id.* Ex. 17.
[34] *See* App. To LLFlex, LLC's Opening Br. in Supp. of its Mot. for Summ. J as to the Amend. Compl. Ex. 1 MUPA 000062 (TSA).
[35] *See id.* MUPA 000069-000070 (TSA).
[36] *See id.* at MUPA 000023 (MUPA § 4.12).
[37] *Id.* at MUPA 000080 (Transition Services Agreement Service Schedule VII – Sales and Marketing Services).
[38] Ex. 3-30 to Pl. AluminumSource, LLC's App. To its Answer. Br. in Opp. To Def.'s Mot. for Summ. J. Ex. 16.

Aluminum submitted evidence that Mr. White did not work full-time for the Mill at Oracle's direction. For example:

- By September 24, 2015, Mr. White performed sales calls and functions for Oracle.[39]
- On October 28, 2015, Aluminum complained that Mr. White was not dedicating his sales efforts to the Mill which was not controverted by Oracle.[40]
- A November 3, 2015 internal Oracle communication emphasizing Mr. White's importance to non-Mill related business.[41]
- A November 4, 2015 email detailing that Mr. White is "absolutely slammed" with non-Mill related work.[42]
- A December 14, 2015 email requesting that Mr. White assist with responding to Aluminum's purchase price adjustment letter.[43]
- Mr. White's assignment as head of Oracle's Customer Service department.[44]
- His 2016 performance review dealing solely with Oracle-related business.[45]

Mr. White testified that nobody at Oracle directed him not to perform his duties as a director of sales for Alpha.[46]

### E. FAILED ARBITRATION

On January 27, 2016, Aluminum emailed Oracle outlining their issues with Oracle's performance under the MUPA (the "Notice").[47] Aluminum alleged that the inventory valuation was not GAAP-compliant.[48]

Section 2.4(c) contains an arbitration clause for closing statement disputes:

2.4 Purchase Price Adjustment.

. . .

(c) Closing Statement Dispute. Within forty-five (45) days following receipt by Seller of the Closing Statement, Seller shall deliver written notice to Buyer of

---

[39] *Id.* Exs. 3-4
[40] *Id.* Ex. 5.
[41] *Id.* Ex. 6.
[42] *Id.* Ex. 7
[43] *Id.* Ex. 8.
[44] *Id.* Ex. 9.
[45] *Id.* Ex. 10.
[46] Deposition of Jack White Dated June 4, 2020 141 (White Dep.).
[47] Ex. 3-30 to Pl. AluminumSource, LLC's App. To its Answer. Br. in Opp. To Def.'s Mot. for Summ. J. Ex. 17.
[48] *Id.* Ex. 17.

any dispute it has with respect to the preparation or content of the Closing Statement. If Seller does not notify Buyer of a dispute with respect to the Closing Statement within such forty-five (45)-day period, such Closing Statement will be final, conclusive and binding on the parties. In the event Seller disagrees with any items contained in the Closing Statement . . . Buyer and Seller shall negotiate in good faith to resolve the Disputed Amount. If Buyer and Seller, notwithstanding such good faith effort, fail to resolve the Disputed Amounts within thirty (30) days after Seller advises Buyer of its objections, then Buyer and Seller jointly shall engage Grant Thornton LLP (the "<u>Arbitration Firm</u>") for final determination of the Disputed Amounts.[49]

Under Section 2.4(c), the parties agreed to engage Grant Thornton as the Arbitration Firm in February 2015.[50] Grant Thornton, however, declined to arbitrate the matter. Grant Thornton contend that SEC independence rules precluded it from providing arbiter services while they had an audit relationship with Oracle's brother-sister company.[51] Subsequent attempts to arbitrate failed with the parties disagreeing about who is the at-fault party.

## F. ARTICLE VII EXCLUSIVE REMEDIES CLAUSE

In the Notice, Aluminum also contended that Oracle failed to deliver the annealing racks, that Oracle failed to provide the sales and marketing services provided for under the TSA, and a delay in purchase obligations under the supply agreement. Aluminum estimated that the cost of replacing the annealing racks was $900,000 and that Mr. White's failure to provide full time sales service cost at least $2 million.

Section 7.10 provides that the indemnification terms under Article VII are "the sole and exclusive remedy of the Buyer Indemnified Parties for any and all Losses or other claims relating to or arising from this agreement or in connection with the

---

[49] App. To LLFlex, LLC's Opening Br. in Supp. of its Mot. for Summ. J as to the Amend. Compl. Ex. 1 000014-000015 (MUPA § 2.4(c)).

[50] 50 Ex. 3-30 to Pl. AluminumSource, LLC's App. To its Answer. Br. in Opp. To Def.'s Mot. for Summ. J. Ex. 18.

[51] *Id.*

transactions contemplated hereby."[52] Section 7.1 creates a survival period of one year from closing for any claims.[53]

The MUPA closed on August 11, 2015 and Aluminum sent the Notice on January 27, 2016.

Section 7.6(a) sets out the procedure that must be followed for making a claim:

7.6 Procedures Relating to Indemnification

> (a) . . . [T]he Indemnified Party shall deliver . . . to the party from which indemnification is sought (the "Indemnifying Party"), a certificate (a "Claim Certificate"), which shall
>
>> (i) state that the Indemnified Party has incurred or anticipates it will incur Losses for which such Indemnified Party is entitled to indemnification pursuant to this Agreement; and
>>
>> (ii) specify in reasonable detail based upon the information then available . . . each individual item of Losses included in the amount so stated, the date such item was paid, the basis for any anticipated liability and the nature of the misrepresentation, breach of warranty, breach of covenant or claim to which each such item is related and the computation of the amount to which such Indemnified Party claims to be entitled hereunder.[54]

The MUPA does not create any additional formalities as to the form of the Claim Certificate or its delivery.

Claims brought outside the Survival Period will not be limited if they fall under Section 7.4(i):

> (i) notwithstanding anything to the contrary herein, none of the restrictions, limitations, caveats or qualifications in this Agreement shall limit any Person's rights, whether substantively or procedurally, with respect to recovery or other remedial relief in respect of intentional misrepresentation or fraud.[55]

---

[52] App. To LLFlex, LLC's Opening Br. in Supp. of its Mot. for Summ. J as to the Amend. Compl. Ex. 1 MUPA 000045 (MUPA § 7.10).
[53] *Id.* MUPA 000039 (MUPA § 7.1).
[54] *Id.* MUPA 000042 (MUPA § 7.6(a)).
[55] *Id.* MUPA 000041 (MUPA § 7.4(i))

### III.    PARTIES' CONTENTIONS

#### A.  COUNT I (FRAUDULENT INDUCEMENT)

Count I is Aluminum's Fraud in the Inducement Claim.  Through this Count, Aluminum contends it was induced through misrepresentations by Oracle to enter in the MUPA.  Oracle's purported misrepresentations relate to the Estimated Working Capital statement, the designation of Grant Thornton as the arbitrator and the delay of the arbitration process once Grant Thornton disqualified itself as arbitrator.

LLFlex contends that Count I is not a fraud claim but a purchase price adjustment claim that should have been submitted to arbitration.  Moreover, LLFlex contends that Oracle's alleged refusal to adjust the purchase price is at most, a breach of contract claim, not a fraud claim.

LLFlex argues that Aluminum cannot provide evidence supporting each element of the claim.  LLFlex contends that there was no false representation because: (i) the Estimated Working Capital Statement was not a representation; (ii) Oracle's representations except those specifically included in Article IV of the MUPA were disclaimed, and (iii) Oracle used a valuation methodology in producing its Estimated Working Capital statement that was consistent with the MUPA while Aluminum's valuation methodology was inconsistent with the MUPA. LLFlex argues that there is no evidence that Oracle knew or believed that its representations were false nor that was there the required intent.  In addition, LLFlex claims that Aluminum cannot establish justifiable reliance because Aluminum was long aware of Oracle's valuation methodology and chose to sign anyway.

Aluminum argues that first, as a matter of contract interpretation, it fulfilled its obligation to attempt arbitration when the parties submitted the case to Grant Thornton and Grant Thornton declined the appointment based on a conflict related to Oracle. Alternatively, even if MUPA

12

required efforts to find a substitute arbitrator, Oracle's actions rendered those efforts futile. Finally, Aluminum states that Oracle and LLFlex waived whatever arbitration rights they had by actively participating in this litigation.

Aluminum further claims that there is evidence of each element its fraudulent inducement claim. Aluminum notes that LLFlex does not challenge several alleged misrepresentations, which Aluminum argues is enough to deny the motion. Aluminum also argues that Oracle made a misrepresentation by issuing the Estimated Working Capital statement in good faith. Next, Aluminum argues that its claims are based only on statements within the MUPA, schedules or documents provided for a deliverable under the MUPA and therefore, the provision disclaiming all representations except for those made under Article IV is irrelevant.

Aluminum submits that there are questions of fact about LLFlex's intent to induce the Aluminum to act. Aluminum states there is evidence that the Oracle wished to rid itself of the Mill because it was losing money and would have considered shutting down and liquidating the Mill. Furthermore, Oracle failure to pay large undisputed sums for delivered product, failure to provide assets and services it had contracted to provide, and attempting to forestall arbitration with cash settlements demonstrate an intent to put Aluminum in a cash-weak position and raises fact questions about Oracle's intent.

## B. COUNT II (BREACH OF CONTRACT)

Count II is Aluminum's Breach of Contract Claim. Aluminum bases its breach of contract claim on two purported failures of LLFlex. Aluminum asserts that Oracle failed to: (i) deliver approximately $900,000 worth of annealing racks necessary for the Mill's operation; and (ii) to provide the full-time services of Jack White under the terms of the Transition Services Agreement (TSA).

13

LLFlex argues that it is entitled to summary judgment because Aluminum brought its claim outside of the contractual limitation period. Under the MUPA, Aluminum can only bring the claim outside of the contractual limitation period if there was an intentional misrepresentation or fraud. LLFlex claims that there is no evidence of intentional misrepresentation or fraud, and therefore, the case must be dismissed.

LLFlex also contends that there was no failure to deliver the annealing racks and that the racks were accurately reflected as assets on the financial statements. Furthermore, even if there was a breach of contract, LLFlex argues that there was no fraud or misrepresentation and therefore, Aluminum cannot bring the claim.

LLFlex also argues that, as a non-party to the TSA, Aluminum does not have standing to bring a claim based on the breach of the TSA. Rather, the claim is based on a breach of a representation that the Assets and services provided under the TSA were used by the Mill and sufficient for current operation of the Mill. Nothing in the representation promised future services by Jack White, therefore, there is no breach of contract claim based on Jack White's failure to provide services. Furthermore, there is no evidence that Oracle intentionally misrepresented Jack White's level of service because any service he failed to provide was because of his own decisions, not under direction by Oracle. Finally, Oracle cannot establish any damages based on Mr. White's failure to perform.

Aluminum contends that it did provide a claim certification or otherwise make a formal demand for indemnification prior to the expiration of the Survival Period. Aluminum cites to the Notice and other communications between Aluminum and LLFlex.

Aluminum argues that LLFlex ignores the parties' intent with the contract. By arguing that Oracle was merely continuing an established practice of transferring the annealing racks to

14

the Packaging Facility, LLFlex ignores that the parties intended for the Mill to operate as an independent business. Aluminum contends that LLFlex's interpretation ignores the parties' agreement to "take such further actions as may reasonably necessary to carry out the intent of this Agreement." Finally, there is no evidence that it was established practice for the Packaging Plant to hold onto the Mill's entire store of annealing racks such that it required shutting down the Mill.

Aluminum also argues, with respect to Mr. White's services, that the TSA contemplates future services and therefore those future services are part of the representations under Section 4.12. Aluminum argues that it provided adequate notice regarding Mr. White within the Survival Period. Finally, Aluminum contends that there is at least a question of fact about Oracle's fraudulent intent because Oracle assigned non-Mill related work and there is evidence that reasonably demonstrates Oracle already planned to do this by the closing date.

Finally, Aluminum argues that there is evidence of damages with respect to Mr. White's services. LLFlex contends that additional sales by Mr. White would not have saved the Mill. Aluminum argues, however, that many of the issues were caused by Oracle, that there is testimony that additional sales by Mr. White would have helped the Mill create a more profitable and sustainable "product mix," and even if Mr. White's decision not to sell for the Mill was justified by un-remedied known quality issues, that creates merely another misrepresentation by Oracle.

## IV. STANDARD OF REVIEW

The standard of review on a motion for summary judgment is well-settled. The Court's principal function when considering a motion for summary judgment is to examine the record to

15

determine whether genuine issues of material fact exist, "but not to decide such issues."[56]

Summary judgment will be granted if, after viewing the record in a light most favorable to a

nonmoving party, no genuine issues of material fact exist and the moving party is entitled to

judgment as a matter of law.[57] If, however, the record reveals that material facts are in dispute,

or if the factual record has not been developed thoroughly enough to allow the Court to apply the

law to the factual record, then summary judgment will not be granted.[58] The moving party bears

the initial burden of demonstrating that the undisputed facts support his claims or defenses.[59] If

the motion is properly supported, then the burden shifts to the non-moving party to demonstrate

that there are material issues of fact for the resolution by the ultimate fact-finder.[60]

## V.  DISCUSSION

### A. COUNT I (FRAUDULENT INDUCEMENT)

LLFlex first argues that Count I is "a purchase price adjustment claim that should have

been submitted to arbitration."[61] Second, LLFlex argues that there is no evidence to support

each element of its fraud claim. As discussed below, the Court holds that Count I fails as a claim

for fraudulent inducement. As presently prosecuted—and on this record--Aluminum asserts that

LLFlex breached Sections 2.4(a) and 2.4(c).

---

[56] *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 99-100 (Del. 1992) (internal citations omitted); *Oliver B. Cannon& Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322, 325 (Del. Super. 1973).
[57] *Id.*
[58] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962); *see also Cook v. City of Harrington*, 1990 WL 35244 at *3 (Del. Super. Feb. 22, 1990) (citing *Ebersole*, 180 A.2d at 467) ("Summary judgment will not be granted under any circumstances when the record indicates . . . that it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").
[59] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1970) (citing *Ebersole*, 180 A.2d at 470).
[60] *See Brzoska v. Olsen*, 668 A.2d 1355, 1364 (Del. 1995).
[61] LLFlex, LLC's Op. Br. in Supp. of its Mot. for Summ. J as to the Amend. Compl. 19.

### i.    *Whether Count I should be arbitrated under Section 2.4(c)*

LLFlex argues that Count I should be arbitrated under Section 2.4(c).  Section 2.4(c) provides that if the parties are unable to resolve any disputes about items in the Closing Statement, then "Buyer and Seller jointly shall engage Grant Thornton LLP (the "<u>Arbitration Firm</u>") for final determination of the Disputed Amounts."[62]  The Closing Statement contains "Buyer's good faith calculations of (i) the Net Working Capital as of the Closing (the "<u>Final Net Working Capital</u>")."[63]  Aluminum's bases its fraudulent inducement claim, in part, on a discrepancy between Oracle's Estimated Working Capital and Aluminum's Net Working Capital as of the Closing.[64]

The problem lies with Grant Thornton and not Aluminum.  Section 2.4 names Grant Thornton as the "Arbitration Firm."[65]  Section 2.4(c) does not provide for alternative Arbitration Firms.[66]  Grant Thornton declined to arbitrate the dispute because SEC independence rules precluded Grant Thornton from providing arbiter services to Oracle.[67]  Arbitration is "a matter of contract."[68]  Furthermore, while public policy favors arbitration, "this presumption will not trump basic principles of contract interpretation."[69]  Furthermore, impossibility to perform a contract by "act of God, the law, or the other party," excuses performance.[70]  In this case, Grant

---

[62] App. To LLFlex, LLC's Opening Br. in Supp. of its Mot. for Summ. J as to the Amend. Compl. Ex. 1 00014-000015 (MUPA § 2.4(c)).

[63] *Id.* 000014 (MUPA § 2.4(b)).

[64] Compl. ¶ 57-64.

[65] App. To LLFlex, LLC's Opening Br. in Supp. of its Mot. for Summ. J as to the Amend. Compl. Ex. 1 000014-000015 (MUPA § 2.4(c)).

[66] *Id.*

[67] AluminumSource, LLC's App. to its Answer. Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 18 ALUMINUM_002047 (". . . we have identified an audit relationship with another portfolio company of Centre Lane Partners which requires that we adhere to SEC independence rules. Under those rules, we are precluded from providing arbiter services to another brother-sister entity of this portfolio company that is also controlled by Centre Lane Partners (OracleFlexible Packaging, Inc.)").

[68] *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 78 (Del. 2006) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

[69] *NAMA Holdings, LLC v. Related World Market Center, LLC*, 922 A.2d 417, 430 (Del. Ch. 2007).

[70] *Peckham v. Industrial Securities Co.*, 113 A. 799, 801 (Del. Super. 1921).

Thornton was unable to arbitrate the dispute because SEC independence rules prevented them from arbitrating the matter and the contract did not provide for alternative arbitration. This means that the law caused the clause to be unenforceable and Aluminum is excused from performing this provision.

### ii. There are no material issues of fact on Count I as a Fraudulent Inducement Claim.

On summary judgment for fraudulent inducement, the non-moving party must show there are material issues of fact regarding each element.

Aluminum first argues that the LLFlex concedes the sufficiency of several alleged misrepresentations by not challenging them in its brief.[71] LLFlex claims that it agreed with Aluminum's assertions related to those alleged misrepresentations and offered an appropriate adjustment "consistent with the purchase price adjustment procedures."[72]

LLFlex argues that the Estimated Working Capital statement is not a representation but merely "good faith calculations" of Net Working Capital.[73] Aluminum, however, asserts that Oracle did not calculate the Net Working Capital in good faith.[74] This constitutes of breach of the MUPA and not a misrepresentation that induced Aluminum to enter into the MUPA. Section 2.4 requires that that the Net Working Capital would be a "good faith calculation" and prepared according to U.S. GAAP.[75] There could be a triable issue as to whether LLFlex breached 2.4 but Aluminum was relying on the Section 2.4 procedure (i.e., Sections 2.4(a), 2.4(b) and 2.4(c)) to

---

[71] Pl. AluminumSource, LLC's Answer. Br. in Opp. to Def. LLFlex, LLC's Mot. for Summ. J. as to the Amend. Compl. 13-14.

[72] LLFlex, LLC's Reply Br. in Further Supp. of its Mot. for Summ. Judg. as to the Amend. Compl. 6.

[73] Def. Oracle Flexible Packaging, Inc.'s Opening Br. in Supp. of its Mot. to Dismiss Pl.'s Compl. 21.

[74] *See* Pl. AluminumSource, LLC's Answer. Br. in Opp. to Def. LLFlex, LLC's Mot. for Summ. J. as to the Amend. Compl. 14.

[75] *See OSI Systems, Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1092 (Del. Ch. 2006) (holding that asserting a Reference Statement did not comply with U.S. GAAP was necessarily asserting a breach of representation when the contract represented that the Reference Statement would be calculated in compliance with U.S. GAAP).

address discrepancies.[76]  There is no colorable fraudulent inducement claim.   Aluminum's fraudulent inducement claim is based on the agreement because Oracle misrepresented that the Estimated Working Capital statement was a good faith calculation and GAAP-compliant.

LLFlex argues that Aluminum was not justified in relying upon Oracle's representations because Aluminum was aware that Oracle valued its inventory at a standard cost of $1.00 per pound and could have determined the Mid-West Transaction Price for aluminum (approximately $.78 per pound) – that Aluminum used to calculate its Final Net Working Capital figure – in a matter of seconds on the day of closing.[77] LLFlex argues further that Mr. Hoyt knew about because Mr. Hoyt sent an email to Mr. Heard stating that: "[Oracle] is probably planning to sell at STANDARD COST."[78] Generally, a party may not claim justifiable reliance where the means of knowledge are readily within its reach or he gains actual knowledge of the falsity of a representation.[79]

The issue, however, is whether Oracle made the Estimated Working Capital statement in good-faith and GAAP-compliant. While this evidence establishes that Aluminum may have or could have known about some bases for the eventual discrepancy between the Estimated Working Capital statement and the Final Net Working Capital statement, it does not establish that Aluminum knew that the Estimated Working Capital statement was not made in good faith or GAAP-compliant.  Furthermore, there is evidence that Mr. Heard represented that there were unaccounted-for costs that made up the difference between the standard $1.00 cost and the $.78

---

[76] *See infra* Section IV(A)(ii)(b).

[77] LLFlex, LLC's Reply Br. in Further Supp. of its Mot. for Summ. Judg. as to the Amend. Compl. 27.

[78] App. To LLFlex, LLC's Opening Br. in Supp. of its Mot. for Summ. J as to the Amend. Compl. Ex. 31.

[79] *See Universal Enterprise Group, L.P v. Duncan Petroleum Corp.*, 2013 WL 3353743 at *14 (Del. Ch. July 1, 2013); *see Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829 at *22 (Del. Ch. Dec. 3, 2018).

figure that Aluminum would have used.[80]  The Court believes that there may be triable issues but as a breach of contract claim and not a fraudulent inducement claim.

The issue of Aluminum's justifiable reliance upon Oracle's representations is immaterial, however, because Delaware law holds that a plaintiff "cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations."[81]  Stated differently, a plaintiff cannot state a claim for fraud simply by adding the term "fraudulently induced" to a complaint that states a claim for breach of contract, or by alleging that the defendant never intended to abide by the agreement at issue when the parties entered into it.[82]

The Court just does not see how a dispute over the Estimated Working Capital statement constitutes fraudulent inducement.  If LLFlex did not act in good faith in the purchase price adjustment process or in selecting Grant Thornton, Aluminum has a breach of contract claim. Furthermore, the Court is skeptical that Aluminum relied upon the actual Estimated Working Capital statement when deciding to enter the contract.   The earliest the Estimated Working Capital statement could have been provided is three days before closing .  Moreover, If Aluminum believed the Estimated Working Capital statement misrepresented the Mill's value, Aluminum had the contractual right to negotiate an adjustment and if not negotiated, then arbitrate.   Therefore, what Aluminum relied upon was the contractual procedure of Estimated Working Capital Statement and the ability to dispute that process through negotiation or arbitration.

---

[80] Gamba Dep. 194:9-17, 196:16-197:13, 199:7-16, 210:19-211:20.
[81] *Narrowstep, Inc. v. Onstream Media Corp.,* 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010) (quoting *Iotex Commc'ns, Inc. v. Defries,* 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998)) (internal quotation marks omitted).
[82] *Id.* (citing *Iotex,* 1998 WL 914265, at *5).

The Court allowed Aluminum to develop a factual record to support Count I. The Court finds that the developed record does not support a fraudulent inducement claim but, potentially, a breach of contract claim.

The Court will grant summary judgment in favor of LLFlex on Count I. The Court will hold a status conference with the parties on why Count I cannot be amended to conform with the facts developed in the litigation. The Court believes that LLFlex has been on notice that Aluminum contends that LLFlex breached Section 2.4. The arbitration failed out of futility. A breach of contract claim could easily be put before a fact finder without further discovery.

**B. COUNT II (BREACH OF CONTRACT)**

Aluminum asserts that Oracle (1) breached Section 4.12 by failing to deliver annealing racks in a usable condition and (2) breached a MUPA representation by failing to provide the services of Mr. White under the Transition Services Agreement.[83]

The first issue is whether Article VII of the MUPA limits Aluminum's claim for breach of contract. Under Section 7.10, Article VII's indemnification terms are "the sole and exclusive remedy of [Aluminum] for any and all Losses or other claims arising from this Agreement or in connection with the transactions contemplated hereby."[84] Section 7.1 sets a one year Survival period from Closing for most claims.[85] Furthermore, under Section 7.1, the Survival Period extends automatically to include any time necessary to resolve any claim asserted before the Survival Period's expiration.[86] The parties executed the MUPA on August 11, 2015.[87] Under Section 7.6, a party claiming indemnification must provide a "Claim Certificate" stating that the

---

[83] Amend. Compl. ¶¶ 92, 99.
[84] App. To LLFlex, LLC's Opening Br. in Supp. of its Mot. for Summ. J as to the Amend. Compl. MUPA 000045 (MUPA § 7.10).
[85] *Id.* at 34-35 (MUPA § 7.1)
[86] *See id.*
[87] *See id.* at 1

21

party has incurred or anticipates incurring losses and reasonably detailing the specifics of such losses to assert a claim.[88]

Aluminum argues that it asserted its rights under Section 7.6 by making several written demands for the return of the annealing racks and compensation for Mr. White. The Court agrees. Although the Notice is not the most formal of demands, the Court finds that, at this stage in the proceeding, it qualified to put LLFlex on notice as to the Estimated Working Capital misrepresentations, racks, and Mr. White's employment.

Section 7.6 requires that the party claiming indemnification must (1) state that it has or anticipates incurring a loss and (2) specify in reasonable detail the losses, including the date the loss was paid, basis for anticipated liability and nature of misrepresentation, breach of warranty, breach of covenant or claim upon which the party bases its claim.[89] The Notice states that Oracle has not delivered the annealing racks, which is "a default," and that the racks have a replacement cost of $900,000 or Oracle could remedy the situation with a rental agreement that would cost over $20,000 a month.[90] About Mr. White's performance, the Notice refers to "withheld marketing and sales services" that constitute "actual and significant lost revenues."[91] The Notice further clarifies that "[t]he customers were pretty clear . . ., as was Jack [White], the hours weren't being put in because Jack was not given the opportunity to not work full time for Oracle."[92] Finally, the Notice estimates that Mr. White's inability to provide sales and marketing services cost Alpha at least $2 million and "constitutes a material default by Oracle on our agreement."[93] Thus, the Court finds that the Notice satisfies Section 7.6's requirements to qualify

---

[88] *Id.* at 37 (MUPA § 7.6)
[89] *See id.*
[90] Exs. 3-30 to Pl. AluminumSource, LLC's App. to its Answer. Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 30.
[91] *Id.*
[92] *Id.*
[93] *Id.*

22

as a "Claim Certificate." This was less than a year after the closing date and therefore, Aluminum timely asserted their breach of contract claims.

### i. Whether Aluminum's claim falls within the intentional misrepresentation or fraud exception under the MUPA § 7.4(i)

Section 7.4(i) provides that "none of the restrictions, limitations, caveats or qualifications in this Agreement shall limit any Person's rights . . . with respect to recovery or other remedial relief in respect of intentional misrepresentation or fraud."

### a. Intentional misrepresentation or fraud with respect to the annealing racks

LLFlex argues that Oracle acted in good faith and that there is no evidence of intentional misrepresentation.[94] Aluminum provides evidence that on August 13, 2015 – two days after Closing – Oracle possessed the annealing racks at their Polo Road facility.[95] This creates a triable issue of fact about whether Oracle intentionally misrepresented that the racks were at the Mill. Therefore, the Court will not grant judgment because the claim could factually fall within the Section 7.4(i) exception.

### b. Intentional misrepresentation or fraud with respect to Jack White's services

LLFlex also argues that there is no evidence of intentional misrepresentation or fraud with respect to Mr. White's services.[96] LLFlex asserts, "Mr. White, not Oracle, made the decision that he would limit his marketing efforts."[97] Aluminum provides evidence that Oracle directed Mr. White to perform several tasks and undertake several responsibilities unrelated to selling aluminum for the Mill, as early as September 2015.[98] This leads to a triable issue of fact

---

[94] *See* Squatrito Aff. ¶ 28; Heard Dep. 232-34; White Dep. 119.
[95] Exs. 3-30 to Pl. AluminumSource, LLC's App. to its Answer. Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 30.
[96] *See* LLFlex, LLC's Reply Br. in Further Supp. of its Mot. for Summ. Judg. as to the Amend. Compl. 34.
[97] *Id.*
[98] *See e.g.* Exs. 3-30 to Pl. AluminumSource, LLC's App. to its Answer. Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 3-10.

about whether Oracle intentionally misrepresented that Mr. White would provide full time sales service for the Mill. Therefore, it would be inappropriate to dismiss this claim on summary judgment because the claim does not fall within the Section 7.4(i) exception.

### ii. Whether Aluminum's claims survive on their substantive basis

LLFlex argues that there is no evidence establishing that either claim was a breach of representations or warranties.

### a. The Annealing Racks Claim

Aluminum premises its claim that Oracle failed to deliver the annealing racks on MUPA Sections 4.10(c) and 4.12. Section 4.10(c) provides:

> (c) . . . [T]he Company owns, free and clear of all Liens, or has a Contract, license or lease to use, all of the personal property and assets shown on the Latest Balance Sheet, acquired thereafter or located at the Leased Real Property, in which case which is material to the Business or its operations (the "The Personal Property") The Personal Property includes all of the material tangible assets used in the conduct of the Business as currently conducted.[99]

Section 4.12 provides:

> 4.12 Sufficiency of Assets. . . . [T]he Company has good, valid and marketable title . . . to each of its assets, Personal Property and properties reflected in the Financial Reports or that are used or held for use in connection with and necessary for the conduct of the Busines as heretofore conducted by the Company (the "Assets") . . . . consistent with past practice, in each case, free and clear of any Liens, except for Permitted Liens. The Assets, together with the services provided under the transition Services Agreement, (a) constitute all of the properties and assets used or held for use in the conduct of the Business as heretofore conducted by the Company, and (b) are sufficient in all material respects for the conduct of the Business as currently conducted.[100]

LLFlex highlights language in Sections 4.10(c) and 4.12 that shows that Oracle only represented that the assets reflected on the financial statements – including the annealing racks –

---

[99] App. To LLFlex, LLC's Opening Br. in Supp. of its Mot. for Summ. J as to the Amend. Compl. MUPA 000021-000022 (MUPA § 4.10(c)).
[100] *Id.* at 000023 (MUPA § 4.12).

are those used "as currently conducted" or as "heretofore conducted" by the Company.[101] LLFlex presented evidence that the past and current practice was for the Mill to deliver metals on the annealing racks to the Polo Road facility and returned only after being used.[102] According to LLFlex, therefore, there was no breach of a representation.

When interpreting a contract, however, the Court must give priority to "the parties' intentions as reflected in the four corners of the agreement."[103] The parties must have intended for the Mill to operate as a separate independent business from the Polo Road facility. First, the MUPA was a sale. If the parties had intended for the Mill to act as an in-house materials supplier, there would not have been a sale at all. Second, the MUPA has a limited non-competition/non-solicitation provision. The parties clearly intended that the two would operate independently and negotiated for a limited period before they potentially completely severed their relationship. Sections 4.10(c) and 4.12 could not possibly operate such that the Polo Road facility could hold onto "almost everyone" of Alpha's annealing racks.[104] . Therefore, LLFlex could have breached the contract if it held almost ever annealing rack at the Polo Road facility, as alleged by Aluminum.

### b. *The Jack White Claim*

LLFlex similarly argues that there could have been no breach because Section 4.12 only represents that the services provided for under the TSA was part of "properties and assets used or held for use in the conduct of the Business as heretofore conducted by the Company, and (b) are

---

[101] LLFlex, LLC's Op. Br. in Supp. of its Mot. for Summ. J as to the Amend. Compl. 32.
[102] *See* Squatrito Aff. ¶ 19; *see* Heard Dep. 232-34; *see* White Dep. 119; *see* Hoyt Dep. 45-46, 225-26; *see* Gamba Dep 167-68.
[103] *United States v. Sanofi-Aventis U.S. LLC*, 236 A.3d 1117, 1129 (Del. 2020).
[104] Exhibits 3-30 to Pl. AluminumSource, LLC's Appendix to its Answer. Br. in Opp. To Def.'s Mot. for Summ. J. Ex. 13.

sufficient in all material respects for the conduct of the Business as currently conducted."[105] Therefore, Oracle only represented that Mr. White's past performance had been sufficient for running the business and made no representations about future service.

The TSA, however, provides for Mr. White to provide full-time service to the Mill (unless he stopped working for Oracle) for no more than nine months from the Closing Date.[106] Therefore, the MUPA represented that Mr. White would provide full-time services to the Mill after the Closing Date. Aluminum provided evidence that Mr. White did not provide full-time services to the Mill.[107] The Court finds that there is a triable issue of fact about whether Mr. White provided full-time services to the Mill and the Court will not grant summary judgment on this claim.

Finally, LLFlex argues that there is no evidence of damages with respect to Mr. White's services. Mr. White testified that the problems with Oracle were "related to quality, service, liquidity, the lack of a business plan . . . . There were ongoing and severe quality issues."[108] Jacob Hoyt, however, testified that the Mill would have been more profitable if Mr. White had sold more of the light-gauge foil that the Mill "was set up to make."[109] Therefore, there is a genuine issue of material fact with regards to the damages caused by Mr. White's alleged failure to sell full time.

---

[105] *See* App. To LLFlex, LLC's Opening Br. in Supp. of its Mot. for Summ. J as to the Amend. Compl. 000023 (MUPA § 4.12).

[106] *See* App. To LLFlex, LLC's Opening Br. in Supp. of its Mot. for Summ. J as to the Amend. Compl. MUPA 00080 (TSA Service Schedule VII – Sales and Marketing Services).

[107] *See e.g.* 3-30 to Pl. AluminumSource, LLC's App. to its Answer. Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 17.

[108] White Dep. 122-23.

[109] Hoyt Dep. 313:16-18.

## VI.     CONCLUSION

For the reasons set out above, the Court will **GRANT** the Motion as to Count I and **DENY** the Motion as to Count II.  The parties shall contact the Court to set up a status conference to discuss why Count I cannot be amended to conform with the facts developed in the litigation as a breach of contract claim.

Dated: January 21, 2021
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc:  File&ServeXpress

27